IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISON

| | | |
|---|---|---|
| SPORTSPLEX OF HOUSTON, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | |
| | § | |
| THE CITY OF HOUSTON, THE CITY OF | § | |
| HOUSTON POLICE DEPARTMENT, and | § | CIVIL ACTION NO. _____ |
| THE CITY OF HOUSTON FIRE | § | |
| DEPARTMENT, | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT &
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff, Sportsplex of Houston, Inc., d/b/a Houston Sportsplex ("Plaintiff" or "Sportsplex") files this Verified Original Complaint and Application for Temporary and Permanent Injunctive Relief against Defendants, the City of Houston, the City of Houston Police Department, and the City of Houston Fire Department.

**INTRODUCTION & REQUEST FOR RELIEF**

1. As night fell on May 1, 2020, upwards of 30 to 40 law enforcement officials descended on a locale in southwest Houston, entered and seized the property without a warrant, threatened to arrest and criminally charge the property's general manager, cite and expel each and every one of the individuals who had the temerity to occupy the premises, all without prior notice or an opportunity to be heard.

2. What prompted such an overwhelming demonstration of governmental power? Average citizens decided for themselves to enjoy a spring evening playing softball outdoors at Plaintiff's business, Sportsplex.

1

3. Under what authority or justification did these officials act? Municipal fiat, derived from an unwarranted interpretation of the Governor's Executive Order GA 18 ("GA 18") to somehow mean that state actors may exercise unfettered police power to decide, on-the-fly, what commercial and recreational activities are unlawful in the time of coronavirus.

4. It is enough that coronavirus has caused an enormous loss of life and wrought unparalleled economic devastation. The residents of this City do not also deserve treatment as *de facto* criminals merely because they have tried to responsibly enjoy some sense of normalcy in these extraordinary times. Defendants have vast powers to respond to the novel SARS-CoV-2 pandemic, but they cannot completely ignore the Constitution.

5. Sportsplex brings this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for violation of its rights secured under Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Sportsplex asks the Court to immediately enjoin the City of Houston and its law enforcement agencies from continuing to use its police power to choke off its livelihood in violation of due process and under the auspices of enforcing the Governor's orders.

## **PARTIES**

6. Sportsplex of Houston, Inc., d/b/a Houston Sportsplex, is a Texas corporation doing business in Harris County, Texas.

7. Defendant City of Houston is a municipal corporation located in Harris County, Texas. It may be served with process by delivering a copy of the summons and of the complaint to the City of Houston City Secretary, 900 Bagby Street, Room P101, Houston, Texas 77002.

8. Defendant City of Houston Police Department is an agency of the City of Houston.

9. Defendant City of Houston Fire Department is an agency of the City of Houston.

## JURISDICTION AND VENUE

10. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over all civil matters arising under the Constitution, laws, or treaties of the United States, and has jurisdiction to award damages and grant equitable or declaratory relief. Specifically, this Court has jurisdiction because this is an action arising under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

11. Venue of this case lies in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claim occurred within the City of Houston.

## FACTS

12. Plaintiff operates Sportsplex. Patrons visit the facility to enjoy fresh air, exercise, and camaraderie at the 30-acre sports venue stretched across four multi-purpose soccer/flag-football fields, eight volleyball courts, and six softball fields like the one depicted below:



13. Sportsplex is among the tens of thousands of law-abiding small enterprises in this state that have sacrificed for the greater good, closing its doors for the past seven weeks to comply with state and local decrees issued to safeguard the public health against coronavirus.

**I.        The State of Texas's Coronavirus Public Health Pronouncements**

14.     Governor Greg Abbott's Executive Order GA 18 ("GA 18") issued on April 27, 2020, brought some hope. GA 18 relates to the expanded reopening of commerce as part of the plan to "Open Texas" in a manner that the State has deemed appropriate to safeguard public health.[1] As it relates to Sportsplex's business activities, GA 18 is clear:

> This executive order **does not prohibit** people from [1] accessing essential or [2] reopened services or [3] **engaging in essential daily activities**, such as … visiting parks, hunting or fishing, **or engaging in physical activity** like jogging, bicycling, **or other outdoor sports**, so long as the necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize in-person contact with people who are not in the same household.[2]

15.     GA 18 expressly allows "engaging in physical activity" and identifies "outdoor sports" as falling in that category. Quite obviously, softball is an "outdoor sport" involving physical activity.[3] Nothing in the plain language of GA 18 says that some "outdoor sports" are allowed and others are not. It does not limit outdoor sports to *ad hoc* pick-up games. It does not prescribe the maximum number of participants who may engage in their chosen outdoor sport. Nor does it ban "outdoor sports" because they are organized and managed by a for-profit business. The only meaningful limitations on outdoor sports is that "necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize-in-person contact."

---

[1] **Exhibit A**, Governor of the State of Texas, Executive Order GA 18, p. 4.
[2] *Id.* at p. 3.
[3] The Attorney General has advised that with respect to identical language in GA 14, "With regard to individuals that desire to play golf, GA-14 expressly allows "engaging in physical activity." Golf is defined as a sport involving physical activity. While GA-14 expressly prohibits "visiting gyms," it permits activities like "jogging and bicycling, so long as the necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize in-person contact with people who are not in the same household. Similarly, a person is not prohibited from playing or practicing golf on property that remains open to the person (such as by holding a membership and/or reserving a tee time), but the person should follow the CDC guidelines pursuant to GA-14." *See* **Exhibit B**, Apr. 17, 2020 Attorney General Letter to Hon. James B. Frank re: Golf course protocols

## II.     Sportsplex Implements the State's Guidance

16.     After GA 18 was issued, Sportsplex advertised its intent to resume outdoor sports activities on May 1, 2020, namely softball and volleyball games. Of course, before it reopened, Sportsplex's proprietors considered how best they could contribute to the protection of public health while advancing the state-endorsed policy objective of supporting economic revitalization.

17.     To that end, Sportsplex relied on a document referred to in GA 18—"Texans Helping Texans: The Governor's Report to Open Texas." ("Report"). The Report is a compilation of evolving explanations, recommendations, and guidelines. Indeed, it provides that citizens and businesses "are encouraged to review, print out, and follow the MINIMUM health protocols recommended by [the Texas Department of State Health Services] and in the checklists on the following pages."[4]

18.     The checklist for outdoor sports recommended that as "outlined in Governor Abbott's GA-18, individuals may engage in outdoor sports, provided that the sports do not include contact with other participants, and no more than four participants play the sport at any time."[5]

19.     Moreover, the checklist explains that because government officials are not omniscient public health sentries capable of issuing "guidance [to] anticipate every unique situation," the people of this state are trusted to exercise their own discretion and "stay informed and take actions based on common sense and wise judgment that will protect health and support economic revitalization."[6]

---

[4] **Exhibit C**, "Texans Helping Texans: The Governor's Report to Open Texas" dated Apr. 27, 2020, Outdoor Sports Checklist, p. 19.
[5] *Id*. at p. 38.
[6] *Id*.

5

20. With those goals in mind, Sportsplex implemented new precautions and protocols in accordance with government-authorized guidelines, recently promulgated industry standards,[7] and the exercise of its own "common sense and wise judgment."

21. Social distancing was to become part-and-parcel of the game of softball when played at Sportsplex. Sportsplex stocked dugouts with hand sanitizer. It banned communal water coolers. It required players to remain six feet apart from each other at all times while not on the field of play, and all other participants were to remain outside the dugout or stationed in the bleachers.[8]

22. On the field, Sportsplex required the catcher to be at least six feet from the batter. All umpires were to stay at least six feet away from the players. Physical contact and tagging of players were banned. The ball itself needed to be sanitized frequently. Given the nature of softball, members of the fielding team were already expected to be positioned dozens of feet apart, whether on the diamond or in the outfield. The traditional sign of good sportsmanship—post-game handshaking—was prohibited. Patrons were not allowed to congregate in the parking lot after games.

23. Off the field, all staff and customers were required to wear masks. Indeed, anyone entering Sportsplex's premises was required to wear a face covering and customers were recommended to continue to wear the mask when not playing. Extra sanitary stations were positioned around the facility. The concession area was subject to an array of social distancing restrictions that matched those imposed by restaurants and other dining facilities.

---

[7] Sportsplex instituted and was following the "Post Covid-19 Return-to-Play Guidelines, Procedures and Recommendations" drafted by United States Specialty Sports Association, which is the national governing body for competitive softball. *Available at* <http://usssa.com/coronavirus>, *last accessed* May 6, 2020.
[8] **Exhibit D**, Houston Sportsplex Rules During COVID-19 Pandemic.

 

24.     In sum, Sportsplex intended to run its business and regulate its patrons as stringently as possible, perhaps even more stringently than many of the "Essential Services" that continue to allow tight groups to congregate and mill around indoor areas without face masks. In the weeks before reopening, Sportsplex broadcast the measures it would take and its intent to reopen on social media.

### III.    Law Enforcement Officials Descend on Sportsplex Without Notice

25.     On the morning of May 1, 2020, a Harris County Constable appeared at Sportsplex to ask whether it would be opening later that day. Barry Horvitz, Sportsplex's General Manager, confirmed that indeed, the business would be open to people wanting to play softball that evening. The constable departed without saying more.

26.     Shortly before 6:00 p.m., two Fire Department personnel appeared at Sportsplex. Sportsplex's lawyer, Ronny Hecht, greeted them. One of the inspectors, Jeannice Mitchel, told Mr. Hecht, to shut down the business because it was in violation of the Governor's order as there were more than four people ready to begin playing softball. Mr. Hecht refused this demand for Sportsplex to shut down and attempted to explain that GA 18 contained no such restriction.

7

27. To obtain further guidance, Ms. Mitchel called her superiors—Fire Department's Assistant Chief, Michelle McLeod, and the Intake Bureau Chief for the Harris County District Attorney's Office, Jim Leitner.

28. Meanwhile, Sportsplex opened its gates for play beginning at 7:00 p.m. All of the rules, protocols, and policies discussed above were in full force and effect. On all six fields, Sportsplex patrons began playing the inherently socially-distanced game of softball.

29. Around this time, a Houston Police Department officer arrived on the scene claiming that there was "suspicious activity." Ms. Mitchel then provided Mr. Hecht a copy of the Report to Open Texas and explained that per Mr. Leitner's directives, the District Attorney's office concluded that Sportsplex was in violation of the GA 18 and the Report because there were more than four people participating.

30. Mr. Hecht requested that he be allowed to speak with Mr. Leitner to explain that GA 18 does not incorporate by reference the non-mandatory guidelines in the Report. Ms. Mitchel told him that it would not be worth his time.

31. Meanwhile, another police sergeant had arrived and called for back-up units. Mr. Hecht continued to explain that there was no basis in GA 18 authorizing officials to close his business down. His protests fell on deaf ears.

32. Indeed, law enforcement had been authorized to arrest Sportsplex's general manager, Mr. Horvitz, and charge him with a crime. According to Ms. Mitchel's report, "[a]fter receiving notice from Chief McLeod that Chief [sic] Leitner's office will take Class B misdemeanor charges for refusing to follow Governor Abbott's executive order GA-18, detailed in the guideline above, Sargent K. Merritt requested several additional HPD units...."[9]

---

[9] **Exhibit E**, Fire Marshal Inspection Report dated May 1, 2020, p. 4.

33. Platoons of police officers appeared within minutes. There was clearly no emergency as officers loitered on the premises for several hours, a few of whom, it might be added, did not don protective face masks:





34. The police sergeant "informed Mr. Horvitz what the consequences of his actions would be"[10] if Sportsplex was not immediately shut down—Mr. Horvitz would be arrested, charged with a Class B Misdemeanor, and all of Sportsplex's patrons would be issued citations.

---

[10] *Id*. at p. 4.

35. As the eight o'clock hour approached, law enforcement officials, without a warrant, took it upon themselves to shut the business down. They fanned out across the premises and began to confront customers, threatening them with citations unless they departed immediately.

36. In an effort to deescalate the situation, avoid the arrest of its personnel, and to preserve goodwill with their customers, Sportsplex closed its operations. The officials finally left Sportsplex around 9:00 p.m., announcing their exploits on social media:



37. None of this was necessary. Sportsplex was operating lawfully. Law enforcement had no right or basis in the law to close the business down, threaten its personnel with criminal charges and arrest, or browbeat law-abiding citizens who were doing nothing more than engaging in recreational activity in these chaotic times with criminal infractions.

## **CAUSES OF ACTION**

38. 42 U.S.C. § 1983 provides that a person who, acting under color of law, subjects or causes to be subjected any United States citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution, shall be liable to the party injured in an action at law.

39. At all relevant times and regarding all relevant actions of the Defendants as alleged in this Complaint, the Defendants were acting in their official capacities, under color of state law, and pursuant to the official policies, practices and customs of the governmental agencies or entities which the Defendants respectfully represent.

40. Defendants, acting under color of law, have subjected and caused Plaintiff to be subjected to the deprivation of its rights, privileges, or immunities as secured by the First, Fourth and Fourteenth Amendments. Specifically, Defendants have violated Plaintiff's right to due process of law, shutting down the business without legal basis, threatening its representatives with arrest unlawfully and without authority.

41. As evidenced by the same conduct vis-à-vis at least one other business in the City of Houston on May 1, 2020, *see Trumps Inc. v. City of Houston, et al*., Cause No. 4:20-cv-01555, Defendants have adopted a custom, practice, and policy of 'enforcing' the Governor's orders by displaying the police power first, asking questions later, and closing businesses down without due process of law.

### **A.      Violation of the Fifth and Fourteenth Amendments**

42. The Fourteenth Amendment provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law," and protects the individual against arbitrary action of government. U.S. CONST. Amend. XIV. Likewise, the Fifth Amendment to the

Constitution provides, in part, that "no person shall be ... deprived of life, liberty, or property, without due process of law." U.S. CONST. Amend. V.

43. Due process is a flexible inquiry that, at a minimum, requires notice and the opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). The Constitution requires notice and "some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). "If … the state is able to provide the affected individual with a hearing before the deprivation occurs, due process usually requires that the state do so." *Augustine v. Doe*, 740 F.2d 322, 327–28 (5th Cir. 1984).

44. Plaintiff has a constitutionally protected property interest in operating its business and holding outdoor sports activities. *See Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 221 (5th Cir. 2012) (recognizing that plaintiff's "ability to operate her business, which, as we have stated, is recognized by courts as an important right"). Additionally, Plaintiff has a constitutionally protected right to be free from seizure of its property without probable cause or adequate justification. *See* U.S. CONST. Amend. IV, V.

45. These interests are significant. The loss of the ability to reopen in light of Defendants' threats and actions imperils Plaintiff's very right to exist. Defendants deprived Plaintiff of these rights under color of law and without due process of law.

46. Defendants were in a position to provide for pre-deprivation process. Defendants cannot claim that the deprivation in this matter was entirely unforeseeable, random, or unpredictable at a given point in time. *See Zinermon,* 494 U.S. at 136. In light of GA 18's language, it was hardly unforeseeable that a business such as Sportsplex would or could reasonably conclude that it could lawfully resume operations on May 1, 2020 in compliance with state decrees. Indeed,

Plaintiff openly and repeatedly advertised on social media its intent to reopen on that date in accord with those dictates and guidelines.

47. Municipal officials, authorized to enforce GA 18 under its terms, could have easily foreseen the need to first obtain clarity regarding any doubts about the application, scope, and enforcement of GA 18 in light of Plaintiff's intent to reopen. *See Zinermon,* 494 U.S. at 136. Instead, it was only once Defendants actually arrived at Sportsplex that they found it necessary to begin consulting with their superiors to decide how to proceed. Indeed, even at that point, Defendant denied Plaintiff an opportunity to be heard by the decisionmakers who instructed officials in the field that they were to arrest Plaintiff's proprietors, expel the patrons, and close the business down.

48. In truth, a pre-deprivation hearing was entirely practicable. As mentioned, Plaintiff had been advertising for *weeks* that it planned to reopen on May 1, 2020. Defendants obviously had knowledge of Plaintiff's intent to reopen as demonstrated in the appearance of a law enforcement official at Sportsplex hours before the facility reopened.

49. No imminent public health emergency manifested from the operation of Sportsplex under the protocols and procedures it implemented in accord with state-sanctioned guidelines. If Defendants believed that Plaintiff's opening would be in violation of GA 18, they could have easily obtained guidance from the Attorney General's office, *see, e.g.*, Exhibit B, obtained a temporary restraining order, and/or sought declaratory relief in order to establish Plaintiff's rights and obligations under GA 18. Instead, Defendants chose to deny Plaintiff due process, circumventing that right by shutting the business down right then and there under threat of immediate arrest.

50. The shock-and-awe tactics of law enforcement foreclosed Plaintiff's opportunity to be heard. The cost of taking such on-the-fly action clearly outweighs the benefit of utilizing

advance notice or procedural safeguards of any sort. "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972); *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 221 (5th Cir. 2012) (Observing that the municipality "did not provide *any* process prior to revoking [plainitff's] permits, which increases the risk of an erroneous deprivation, and means that any procedural safeguards would be highly valuable").

51. The authority under which Defendants purported to act—the Governor's executive order—provides no post-deprivation procedure or remedy for the unlawful enforcement of its dictates. *See Martin v. Dallas County, Tex.*, 822 F.2d 553, 555 (5th Cir. 1987). There is no right to appeal from Defendants' actions or review their command that Sportsplex must remain shuttered under their interpretation of GA 18. The only avenue for rectifying this violation of due process is the relief sought herein.

52. Moreover, GA 18 itself explains that the Governor suspended various provisions of the Texas Government Code and Health and Safety Code, and, most importantly, "any other relevant status, to the extent necessary to ensure that local officials do not impose restrictions inconsistent with this executive order, provided that local official may enforce this executive ordered as well as local restrictions that are consistent with this executive order."[11]

53. The issuance of Executive Order GA 21 on May 5, 2020, does not eliminate the harm that has occurred or the threat of ongoing harm.[12] Nor does the fact that circumstances might change in the future alter the analysis. The harm has been done and subsists. "[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes v. Shevin*, 407 U.S. 67, 84–85, (1972).

---

[11] **Exhibit A**, Report, p. 6
[12] **Exhibit A1**

**B.   Declaratory Relief**

54. Section 1983 authorizes a plaintiff to seek declaratory relief. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 673 (2010) (section 1983 suit brought for violations of First and Fourteenth Amendments sought injunctive and declaratory relief). Plaintiff seeks declaratory relief on the following issues—

   (a) Whether the Governor's executive orders, specifically GA 18, authorize or permit Defendants to close or impede Plaintiff's otherwise lawfully-operated business; and

   (b) Whether the enforcement of the Governor's executive orders permits Defendants to close or impede Plaintiff's otherwise lawfully-operated business without providing Plaintiff notice and an opportunity to be heard before taking such actions.

**APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

55. Plaintiff seeks a temporary and permanent injunction prohibiting Defendants as follows:

   a. Defendants are prohibited from arresting or threatening any employee or representative of Plaintiff, Sportsplex of Houston, Inc. d/b/a Houston Sportsplex for conducting operations;

   b. Defendants are prohibited from closing or attempting to close Sportsplex under color of Governor Greg Abbott's Executive Order GA 18 or GA 21;

   c. Defendants are prohibited from maintaining a physical presence at Sportsplex, or within 400 meters of the Sportsplex premises, for longer than thirty minutes, unless investigating criminal activity with probable cause;

   d. Defendants are prohibited from entering Sportsplex property unless requested by Sportsplex;

   e. Defendants shall produce all documents and communications relating to investigations of Sportsplex from the time period of April 1, 2020 through May 8, 2020, and shall produce them five days before the hearing on Plaintiff's temporary injunction; and

    f. Defendants shall produce a privilege log and articulate the legal basis for any privilege they assert for all documents withheld from subsection d. above, and shall produce it five days before the hearing on Plaintiff's temporary injunction.

56. Plaintiff is entitled to injunctive relief because it has (1) a substantial likelihood of success on the merits; (2) Defendants' conduct presents a substantial threat that it will suffer irreparable injury absent the injunction; (3) this threatened injury outweighs any harm the injunction might cause the Defendants; and (4) the injunction will not impair the public interest.

57. Plaintiff has a strong likelihood of success on the merits. Plaintiff has a constitutionally protected property and liberty interests as set forth above. The risk of erroneous deprivation of such interests in violation of Plaintiff's due process rights is certain to continue so long as coronavirus remains part of our collective experience. There is a strong interest in protecting Plaintiff from further deprivations of its constitutional rights because, as mentioned above, Defendants' conduct, if not abated, will cause Plaintiff to permanently go out of business, all without an opportunity to be heard.

58. Absent an injunction, Plaintiff will suffer irreparable injury. Businesses have a right to transact lawful business without fear of being shut down without warning. The loss of constitutional freedoms for "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, in the context of a pre-deprivation due process violation, "no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes*, 407 U.S. at 82; *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process"). Under Defendants' existing regime of applying and enforcing the Governor's executive orders without affording Plaintiff due process of law,

Plaintiff cannot reopen and will ultimately be forced to close permanently. Monetary relief is therefore insufficient as a matter of law because the harm Plaintiff will suffer and has suffered between now and trial if not allowed to operate will result in the loss and extinction of its business.

59. An injunction will not significantly burden any of the Defendants' interests, but will instead serve and enhance the public's interests. Nothing in the injunction in any way inhibits Defendants' legitimate law enforcement function vis-à-vis Plaintiff. Indeed, the public interest favors the issuance of injunctive relief to protect the constitutional rights at stake in this case and to ensure that Defendants do not exercise such unbridled authority without affording citizens due process of law.

## ATTORNEYS' FEES

60. Plaintiff requests payment of its reasonable attorneys' fees and costs. Plaintiff is entitled to recover reasonable and necessary attorneys' fees and expert fees. 42 U.S.C. § 1988.

## CONDITIONS PRECEDENT

61. All conditions precedent have been performed or have occurred.

## PRAYER

WHEREFORE, Plaintiff, Sportsplex of Houston, Inc. d/b/a Houston Sportsplex, respectfully requests that judgment be entered in their favor and that it be awarded the following forms of relief:

      a. Injunctive and declaratory relief;
      b. Prejudgment and post-judgment interest as allowed by law;
      c. Attorneys' fees;
      d. Expert fees;
      e. Costs of suit; and
      f. All other relief, in law and in equity, to which Plaintiff may be justly entitled.

        Respectfully submitted,

        WALLACE & ALLEN, LLP

        */s/ Casey T. Wallace*
        Casey T. Wallace
        State Bar No. 00795827
        Benjamin W. Allen
        State Bar No. 24069288
        William X. King
        440 Louisiana, Suite 1500
        Houston, Texas 77002
        Tel: (713) 224-1744
        Fax: (713) 227-0104
        cwallace@wallaceallen.com
        ballen@wallacellen.com
        wking@wallaceallen.com
        **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2020, I served a copy of the Original Complaint on the following individuals via ECF and/or email transmission in compliance with the Federal Rules of Civil Procedure.

    Damon Crenshaw
    Senior Assistant City Attorney
    City of Houston Legal Department
    900 Bagby, Third Floor
    Houston, Texas 77002
    Damon.Crenshaw@houstontx.gov
    **ATTORNEY FOR DEFENDANTS**

        */s/ Casey T. Wallace*
        Casey T. Wallace